

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00045-CV

_____

VEENA SHARMA, Appellant

V.

GUATAM JANI, Appellee

On Appeal from the 481st District Court
Denton County, Texas
Trial Court No. 16-09986-362

Before Kerr, Bassel, and Walker, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

Veena Sharma appeals from the trial court's final divorce decree. In three issues, she complains that (1) the trial court abused its discretion by not granting her new-trial motion; (2) the evidence is legally and factually insufficient to support the trial court's finding that she and Appellee Guatam Jani were informally married; and (3) the evidence is legally and factually insufficient to support the trial court's findings that she had committed fraud on the community marital estate. Although the trial court did not abuse its discretion by denying Sharma's new-trial motion and the evidence suffices to support the trial court's informal-marriage and fraud-on-the-community findings, we conclude that insufficient evidence supports the trial court's finding of the amount by which Sharma defrauded the community estate. For this reason, we reverse the trial court's decree as to the amount of the fraud-on-the-community finding and remand the case for a division of property consistent with this opinion.

## I. Background

Sharma and Jani, both of whom are Hindu, met through an Indian matrimonial website in late 2005. They started living together in April 2006, and on July 8, 2006,

the couple participated in a ceremony conducted by a Hindu priest at a Hindu temple in Houston. The couple continued to cohabitate after the ceremony.[1]

The couple then moved to North Texas. Sharma purchased two homes in her name only in Justin, Texas: one on Windthorst Way in 2008 and another on Jasmine Springs Drive in 2011. The couple lived together in the Windthorst home, and the Jasmine Springs home was a rental property.

In May 2013, Sharma and Jani signed a notarized "Affidavit of Marriage" that stated, "[W]e are married under Hindu Marriage Act/Rights/Customs and are living together as [a] married couple since 07-08-2006 (date of marriage)." In July 2013, the couple signed fertility-treatment consent forms as husband and wife. The couple had a child in March 2014.

In December 2016, Sharma sued for divorce and for sole managing conservatorship of the couple's child. In her original divorce petition, Sharma alleged that "[t]he parties were married under the Hindu Marriage Act/Rights/Customs on or about July 8, 2006." Sharma's amended divorce petition, which she filed in July 2017, similarly alleged that "[t]he parties were married on or about July 8, 2006." But in March 2019, she filed a "First Amended Petition in Suit Affecting the Parent Child Relationship" in which she alleged that she had "determined that she could not be

---

[1]It is undisputed that the parties did not enter into a ceremonial, or "formal," marriage under Texas law, which requires the parties to obtain a marriage license and participate in a marriage ceremony. *See generally* Tex. Fam. Code Ann. §§ 2.001–.302.

3

married to [Jani] because he remains married to his wife Trupti Jani who is from India."[2] Jani countersued, alleging that Sharma has committed actual and constructive fraud on the community marital estate.

In spring 2019, the trial court ordered that Jani could live in the Jasmine Springs home if he satisfied the approximately $10,000 mortgage arrearage on the property and if he paid the monthly mortgage payment of $1,694.58 starting on June 1, 2019. Jani did so and resided in the Jasmine Springs home during the case. Sharma continued to live in the Windthorst home.

Starting on November 20, 2019, the case was tried to the bench in three different trial courts over five nonconsecutive days in 2019, 2021, and 2022.[3] The parties disputed the significance of the 2006 ceremony at the Hindu temple. Sharma maintained that the ceremony was not a marriage ceremony but was an engagement ceremony. She explained that the couple had an engagement ceremony "because living [together] without any relationship in our culture is like, taboo." She claimed

[2]Because Sharma makes no complaint about the trial court's rulings on conservatorship, possession and access, child support, and medical and dental support, we do not discuss the facts related to those issues.

[3]On November 20, 2019, and December 12, 2019, the parties tried the case to the presiding judge of the 462nd Judicial District Court. In January 2021, the case was transferred to the 467th Judicial District Court. The presiding judge of that court heard the case on October 15, 2021. In March 2022, the case was transferred to the 481st Judicial District Court. That court's presiding judge heard the final two days of trial on July 19, 2022, and August 3, 2022; signed the final divorce decree; and heard Sharma's new-trial motion. Neither party objected to this "round-robin" trial.

that the ceremony's purpose was to "give [a] name to the relationship," which "legitim[ized] living together," because "an unmarried man and woman . . . without any relationship is not good in our culture." According to Sharma, an engagement ceremony and other small ceremonies precede the wedding ceremony, and the hallmarks of a Hindu marriage ceremony include a license issued by the priest or a court and a grand ceremony and reception with the bride's and groom's families present. Sharma testified that she and Jani did not get a license or have a large ceremony and reception with their families. She was adamant that the 2006 ceremony was not a marriage ceremony.

Photographs of the 2006 ceremony were admitted into evidence. In these photographs, Sharma and Jani are wearing traditional Indian clothing, and a priest and a family friend are with the couple in some of the photographs.

Dinesh Pancholi, a priest at a Hindu temple in Plano,[4] testified that a Hindu wedding ceremony does not have to be performed in front of family and friends but can be performed with just the bride, groom, and priest present. He further testified that a license for a Hindu marriage is required in the United States but is not required for a Hindu marriage in India. He concluded that based on his knowledge and experience as a Hindu priest,[5] the photographs depicted a Hindu marriage ceremony.

---

[4]Pancholi did not perform the 2006 ceremony.

[5]The trial court did not permit Pancholi to testify as an expert.

He pointed to the priest's presence, the couple's exchanging rings, the placement of vermillion in the center part of Sharma's hair,[6] a red thread connecting Sharma and Jani, and Sharma's gold-and-black-beaded necklace, which he identified as a mangalsutra,[7] as indicia of a Hindu marriage ceremony. Pancholi stated that based on the photos, the ceremony was not an engagement ceremony; it was a marriage ceremony.

Jani also testified that the ceremony was a marriage ceremony. According to him, a man's placing vermillion in the part of the woman's hair and a man's giving the woman a mangalsutra are not part of an engagement ceremony. He did both of those things at the 2006 ceremony. Sharma, in contrast, maintained that the photographs depicted an engagement ceremony, and when she was asked what the necklace that she was wearing in the photographs was called, she said that it was "like any other necklace."

Sharma also denied signing the Affidavit of Marriage and claimed that her signature on that document was not her "true signature." But the notary who had notarized the affidavit identified Sharma at trial, testified that he had notarized her signature on the affidavit, and agreed that there was no chance that anyone other than Sharma had signed the affidavit. Furthermore, Jani's handwriting expert testified that

[6]Vermillion is a red powder that is placed on the bride's forehead to signify that she is married.

[7]A mangalsutra is a type of necklace that indicates that a woman is married.

6

he had compared Sharma's signature on the affidavit with nine of her known signatures and concluded that the signature on the affidavit belonged to Sharma.

But Sharma nevertheless maintained that the parties did not agree to be married, did not live together as husband and wife, and did not hold themselves out to others as married. She testified that the couple did not have joint bank accounts and that they were not involved in each other's finances.[8] Sharma filed her income taxes as "single" or "head of household" from 2006 through 2022. Sharma further testified that since 2006, she had executed property leases as a single person, purchased car insurance in her name only as a single person and covering only herself, taken out life insurance as a single person, and purchased the Windthorst and Jasmine Springs homes in her name only.[9]

Sharma admitted that in July 2013, she and Jani had signed consent forms with the Dallas Fertility Clinic in spaces labeled "husband" and "wife." She explained that she did so because there was no place on the forms—which were admitted into evidence—to explain the status of their relationship and that when someone with the clinic had asked her if she was married to Jani, she said that the couple was unmarried.

---

[8]When the Jasmine Springs home was being used as a rental property, the tenants made their rental payments to Sharma.

[9]The Jasmine Springs deed of trust stated that Sharma was "an unmarried woman." The deed of trust for the Windthorst home was not admitted into evidence, but Jani conceded that his name was not on the Windthorst home's title documents.

According to Jani, however, the Dallas Fertility Clinic treated only married couples at that time.

In contrast to Sharma, Jani insisted that the couple was married. He testified that in late April or early May 2006, the couple had agreed to get married and started making ceremony preparations. He further testified that since the July 2006 ceremony, he and Sharma had lived together, had traveled as husband and wife, and had held themselves out as married to their friends and family. He affirmed that both he and Sharma had signed the Affidavit of Marriage. He also claimed that he had stated on immigration documents that he was married to Sharma[10] and that he had filed his 2017 and 2018 tax returns as "married filing separately."[11] As additional proof of their marriage, Jani offered into evidence several greeting cards directed to "my husband" that Sharma had given to him. Jani also testified that after the 2006 ceremony, Sharma continued to wear the mangalsutra that he had given her and that she wore it during a housewarming ceremony for the Jasmine Springs home after it was purchased in 2011. But when confronted with photographs of her and Jani participating in the

---

[10]Jani moved from India to the United States in 2001. At the time of trial, he was still not a legal resident, but he did have authorization to work in the United States, a social security number, and a Texas driver's license.

[11]Jani had initially filed his 2017 and 2018 tax returns as "single" but amended them to reflect "married filing separately" because, according to him, his accountant had made a mistake.

housewarming ceremony, Sharma denied that the gold-and-black-beaded necklace that she was wearing was a mangalsutra.

In addition to denying that she and Jani were informally married, Sharma claimed that she and Jani could not have been married because he was still married to Trupti Jani, a woman to whom he was married in India years before. Jani explained that he and Trupti had not been legally married under Hindu law, but they had lived together for almost 16 years and had children together. The couple separated in 2000. Jani believed that because he and Trupti had lived together for so long and had children together, the couple was considered married and thus needed to get a divorce. He claimed that they were divorced in India in 2001.

Also relevant to this appeal, the trial court heard testimony about Sharma's liquidation of a retirement account and Jani's mortgage payments on the Jasmine Springs home. In December 2020, Sharma liquidated a retirement account, transferred the $20,986.04 in funds into her bank account, and started withdrawing those funds. Regarding the Jasmine Springs mortgage, the trial court had signed temporary orders allowing Jani to live in the home if he paid the $1,694.58 monthly mortgage payment starting on June 1, 2019. The monthly mortgage amount in the temporary orders was based on Sharma's representation to the trial court.

Jani testified that starting June 1, 2019, he had made the monthly payments to Sharma,[12] but unbeknownst to him, the actual monthly mortgage payment due to the lender was less than the amount he was paying to Sharma, and she kept the difference. Sharma even stopped making the mortgage payments altogether for a time, and when she modified the mortgage to roll in the unpaid principal and interest, the principal balance on the loan increased from roughly $109,000 to $114,000.

Jani moved for judgment on the informal-marriage issue. The trial court found that Jani and Sharma were married.

The trial court signed a final divorce decree granting the parties a divorce and dividing the community estate. The trial court awarded the Windthorst home to Sharma and the Jasmine Springs home to Jani. In the decree, the trial court found that Sharma had committed actual and constructive fraud on the community and against Jani by intentionally mispresenting the monthly mortgage amount on the Jasmine Springs home, by not disclosing that she was collecting sums from Jani that exceeded the mortgage payments, by not disclosing that she had ceased making monthly mortgage payments, and by collecting sums from Jani and not applying them to the mortgage. The trial court further found that Sharma had committed actual and constructive fraud against Jani by causing the principal balance on the Jasmine Springs home to increase by $5,000 and that she had wasted Jani's community interest in the

---

[12]Jani was unable to pay the mortgage payment directly to the lender because the loan was in Sharma's name.

retirement account by liquidating it. The trial court awarded Jani a $42,362.55 judgment against Sharma for her fraud and waste.

Sharma timely moved for a new trial, arguing that the divorce decree should be set aside for good cause and in the interest of justice because despite her due diligence, "vital evidence was not considered during the trial showing that [Jani's] prior marriage to Trupti Jani was never dissolved." Sharma claimed that the Indian divorce decree that Jani had produced to her as proof of his divorce from Trupti was "fraudulent" because "the document [was] not a dissolution of any marriage involving" Jani. After a hearing, the trial court denied the motion.

Sharma has appealed and argues in three issues that the trial court abused its discretion by denying her new-trial motion and that the evidence is insufficient to support the trial court's informal-marriage and fraud findings. We address each of these issues in turn.

## II. Sharma's New-Trial Motion

In her first issue, Sharma argues that the trial court abused its discretion by denying her new-trial motion because (1) she established that Jani had relied on "fraudulent evidence" at trial to prove that he was divorced from Trupti and (2) when confronted with that evidence at the hearing on Sharma's new-trial motion, Jani claimed for the first time that he had never been married to Trupti. Sharma contends that her trial counsel was "diligent in attempting to obtain, authenticate, and verify the

11

information in the alleged decree of divorce that [Jani] relied on as proof he was divorced from Trupti . . . and thus legally capable of marrying [Sharma]."

## A. Evidence regarding Jani and Trupti's divorce

According to Sharma, throughout the case, Jani had "alluded to the existence of a document establishing his divorce" from Trupti. On the third day of trial—October 15, 2021—Jani finally produced to Sharma a copy of a document that purported to be his and Trupti's divorce decree from India. Because the document was in an Indian dialect that Sharma did not understand, her counsel explained to the trial court that additional time was needed to authenticate and translate the document.

On the fourth day of trial—July 19, 2022—Sharma attempted to call an expert witness from India (Krunal Mehta) to testify that the document that Jani had provided to her as proof of his divorce from Trupti "ha[d] nothing to do with any divorce" and did not involve Jani and Trupti as parties. Jani objected to the expert's testifying, and the trial-court judge took "the matter under advisement," stating, "I will make the determination as we get started in the hearing whether or not I will allow that witness to testify." The trial court never ruled on whether Sharma's expert witness would be allowed to testify that day.[13] And Sharma never attempted to call her expert to testify on the fifth and final day of trial.

---

[13]In her brief, Sharma states Jani testified on the fourth day of trial that the document he had provided to her as evidence of his divorce from Trupti was "an official copy of his divorce document from Trupti." Although Jani was questioned about whether several documents pertained to his divorce from Trupti, it is

At the hearing on her new-trial motion, Sharma attempted to present evidence from Jani and Mehta, a lawyer practicing in India, regarding Jani and Trupti's divorce. Jani objected, arguing that Sharma was attempting to introduce evidence that she knew about at the time of trial but did not offer. The trial court sustained Jani's objections and allowed Sharma to make offers of proof.

When Jani was asked whether he believed that he was divorced from Trupti, Jani responded, "Actually, I never married with her." Sharma objected to his answer as nonresponsive, and the trial court sustained that objection. Jani then testified that he believed that Exhibit B—which was not included in the offer of proof and is thus not in the record—was a copy of his divorce decree from India.[14]

Mehta began his investigation into Jani's Indian divorce at least as early as November 2, 2021, when he requested documents from a court in India. He testified that Exhibit B was not properly signed, was improperly stamped, and did not mention Jani or his and Trupti's children. Sharma, however, testified that Exhibit I, which was admitted into evidence, was a certified English translation of Exhibit B. Exhibit I is an

_____

impossible for us to determine what documents he was testifying about because those documents were not admitted into evidence.

[14]Based on the parties' testimony at the hearing on the new-trial motion and the new-trial motion itself, it appears that the Exhibit B referenced during the hearing is the same document that was attached to the new-trial motion as Exhibit B. According to the new-trial motion, Jani "fraudulently claimed" that Exhibit B—a document that is not written in English—"was his divorce decree rendered in India several years prior."

English translation of an August 2001 divorce decree involving Jani and Trupti. The trial court denied Sharma's new-trial motion.

## B. Standard of review

We review a trial court's order denying a motion for new trial for an abuse of discretion. *See In re Marriage of Sandoval*, 619 S.W.3d 716, 721 (Tex. 2021). A trial court abuses its discretion if it acts without reference to any guiding rules or principles— that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

## C. Discussion

A trial court may grant a new trial for good cause on a party's motion or on the court's own motion. Tex. R. Civ. P. 320. A trial court may grant a new trial based on newly discovered evidence. *See Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010). Additionally, "[f]raud practiced on the court is always ground for vacating the judgment, as where the court is deceived or misled as to material circumstances." *In re Marriage of Hutcherson*, No. 12-18-00345-CV, 2019 WL 4727843, at *2 (Tex. App.— Tyler Sept. 27, 2019, no pet.) (mem. op.) (quoting *Pinkston v. Pinkston*, 266 S.W.2d 515, 519 (Tex. App.—Waco 1954, writ ref'd n.r.e.)). "In cases where a witness willfully testifies falsely regarding a material fact, a new trial may be granted." *In re E.S.*,

14

No. 02-20-00407-CV, 2021 WL 2149627, at *9 (Tex. App.—Fort Worth May 27, 2021, pet. denied) (mem. op.) (citing *Marriage of Hutcherson*, 2019 WL 4727843, at *3–4).

Here, Sharma asserts that Jani relied on "fraudulent evidence" to prove that he was divorced from Trupti and suggests that he falsely testified during the trial that he had been married to Trupti. But Sharma's offers of proof did not bear this out, especially Exhibit I—the certified English translation of Jani and Trupti's 2001 Indian divorce decree. Moreover, Sharma failed to prove that the evidence included in her offers of proof had been discovered since the trial and failed to provide any reason why she did not present that evidence at trial. *See Waffle House*, 313 S.W.3d at 813 (stating that a party seeking a new trial on newly discovered evidence must demonstrate, among other things, that it discovered the evidence after the trial and its failure to discover the evidence sooner was not due to lack of diligence). We thus conclude that the trial court did not abuse its discretion by denying Sharma's new-trial motion. We overrule Sharma's first issue.

### III. Sufficiency of the Evidence

Sharma's second and third issues challenge the sufficiency of the evidence supporting the trial court's informal-marriage and fraud findings.

### A. Standard of review

Here, neither party requested—and the trial court did not file—findings of fact and conclusions of law. In a trial to the court in which no findings of fact or

15

conclusions of law are filed, the trial court's judgment implies all findings of fact necessary to support it. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017). When a reporter's record is filed, these implied findings are not conclusive, and an appellant may challenge them by raising issues challenging the legal and factual sufficiency of the evidence to support the judgment. *Id.* We apply the same standard when reviewing the sufficiency of the evidence to support implied findings that we use to review the evidentiary sufficiency of jury findings or a trial court's express findings of fact. *Id.* We must affirm the judgment if we can uphold it on any legal theory supported by the record. *Rosemond v. Al-Lahiq*, 331 S.W.3d 764, 766–67 (Tex. 2011).

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). In determining whether legally sufficient evidence supports the challenged finding, we must consider evidence favorable to the finding if a reasonable factfinder could, and we must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in

16

support of the challenged finding. *Gunn*, 554 S.W.3d at 658 (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). If reversing for factual insufficiency, we must detail the evidence relevant to the issue in consideration and clearly state why the finding is factually insufficient—that is, why the evidence supporting the finding is so weak or is so against the great weight and preponderance of the evidence that the finding is manifestly unjust, shocks the conscience, or clearly demonstrates bias. *Pool*, 715 S.W.2d at 635.

When conducting a factual-sufficiency review, we do not substitute our judgment for that of the factfinder. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The factfinder is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *Id.*

## B. Informal marriage

In her second issue, Sharma argues that the evidence is insufficient to support the trial court's finding that she and Jani were informally married. She contends that

"[t]here was no reliable evidence that the parties met the elements of an informal marriage," especially because she had asserted throughout the couple's relationship that she was unmarried.

### 1. *Applicable law*

In Texas, an informal or "common-law" marriage exists when the parties agreed to be married, and after that agreement, they lived together in Texas as spouses and represented to others in Texas that they were married. Tex. Fam. Code Ann. § 2.401(a)(2); *Luna v. Garcia*, No. 02-23-00209-CV, 2023 WL 7400927, at *4 (Tex. App.—Fort Worth Nov. 9, 2023, pet. denied) (mem. op.). The existence of an informal marriage is a fact question, and the party seeking to establish the marriage's existence bears the burden of proving the elements by a preponderance of the evidence. *Small v. McMaster*, 352 S.W.3d 280, 282–83 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). An informal marriage does not exist until the concurrence of all required elements. *Id.* at 283.

Because Sharma challenges the sufficiency of the evidence establishing each element, we address each element in turn.

### 2. *Analysis*

*First*, Jani was required to prove that he and Sharma agreed to be married. *See* Tex. Fam. Code Ann. § 2.401(a)(2). To establish an agreement to be married, "the evidence must show the parties intended to have a present, immediate, and permanent marital relationship and that they did in fact agree to be husband and wife." *Garcia v.*

*Garcia*, No. 02-11-00276-CV, 2012 WL 3115763, at *3 (Tex. App.—Fort Worth Aug. 2, 2012, no pet.) (mem. op.) (quoting *Small*, 352 S.W.3d at 283). An agreement to be married may be established by direct or circumstantial evidence. *Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993); *Small*, 352 S.W.3d at 283. "The testimony of one of the parties to the marriage constitutes some direct evidence that the parties agreed to be married." *Small*, 352 S.W.3d at 283 (citing *Eris v. Phares*, 39 S.W.3d 708, 714 (Tex. App.—Houston [1st Dist.] 2001, pet. denied)). Evidence of an agreement may be inferred from cohabitation and the parties' representations. *Eris*, 39 S.W.3d at 714.

Here, Sharma and Jani met through an Indian matrimonial website in late 2005. Sharma testified that she was seeking marriage through the website. The couple started living together in April 2006. According to Jani, in late April or early May 2006, the couple agreed to get married, and they started preparing for the ceremony.

In July 2006, Sharma and Jani took part in a ceremony led by a Hindu priest in a Hindu temple in Houston. Jani testified that it was a marriage ceremony, and Pancholi—a Hindu priest—testified that the ceremony shown in the July 2006 photographs was a marriage ceremony. Both Jani and Pancholi explained that the ceremony had the characteristics of a marriage ceremony—a Hindu priest's presence, the couple's exchanging rings, the placing of vermillion in the center part of Sharma's hair, and Jani's giving Sharma a mangalsutra. This evidence—along with the couple's living together and the notarized Affidavit of Marriage signed by Sharma and Jani stating that the couple was married "under Hindu Marriage

19

Act/Rights/Customs" and had been living together as a married couple since July 8, 2006—is legally sufficient evidence of an agreement to be married.

Turning to the contrary evidence, Sharma insisted that she and Jani never agreed to be married, did not live together as husband and wife, and did not represent to others that they were married. She explained that the July 2006 ceremony was not a marriage ceremony but was an engagement ceremony meant to define the couple's relationship and to legitimize their living together. She also denied having signed the Affidavit of Marriage, despite contrary testimony from Jani, the notary, and the handwriting expert. Although there was conflicting evidence about whether the couple had agreed to be married, the trial court was the sole judge of the witnesses' credibility and the weight to be given to their testimony. *See Golden Eagle Archery*, 116 S.W.3d at 761. We thus hold that the credible evidence supporting the trial court's implied finding of an agreement to be married was not so weak that the finding should be set aside and a new trial ordered.

*Second*, Jani was required to prove that after agreeing to be married, the couple lived together in Texas as spouses. *See* Tex. Fam. Code Ann. § 2.401(a)(2). Sharma admits that she and Jani lived together in Texas "during the relevant time period"— over ten years from the July 2006 ceremony until they separated when she filed her divorce petition in December 2016—but argues that the evidence is insufficient to support a finding that they lived together as spouses because there was a "distinct[] lack of testimony that they did so as husband and wife." Although Sharma testified

20

that the couple had not lived together as husband and wife, she and Jani averred in the May 2016 Affidavit of Marriage that they had lived together as husband and wife since July 8, 2006. Moreover, because Sharma concedes that the couple cohabitated during the relevant time and because we have already determined that the evidence is legally and factually sufficient to support the trial court's agreement-to-be-married finding, the evidence is legally and factually sufficient to support the trial court's implied finding that Sharma and Jani lived together as husband and wife. *See Small*, 352 S.W.3d at 284 (holding evidence was sufficient to support the living-together-as-spouses element where one party conceded that the couple had lived together "during the relevant time" and the court had already determined that the evidence was sufficient to show an agreement to be married).

*Third*, in addition to living together as spouses after agreeing to be married, Jani was also required to establish that the couple represented to others in Texas that they were married. *See* Tex. Fam. Code Ann. § 2.401(a)(2). This statutory requirement is synonymous with the judicial requirement of "holding out to the public." *Garcia*, 2012 WL 3115763, at *4; *Small*, 352 S.W.3d at 284–85. "Holding out" may be established by the parties' conduct and actions; "spoken words are not necessary to establish representation as husband and wife." *Garcia*, 2012 WL 3115763, at *4 (citing *Winfield v. Renfro*, 821 S.W.2d 640, 648 (Tex. App.—Houston [1st Dist.] 1991, writ denied)). Occasional introductions as husband and wife are insufficient to establish the holding-out element. *Small*, 352 S.W.3d at 285 (citing *Lee v. Lee*, 981 S.W.2d 903,

907 (Tex. App.—Houston [1st Dist.] 1998, no pet.)). "The couple's reputation in the community as being married is a significant factor in determining the holding out element." *Danna v. Danna*, No. 05-05-00472-CV, 2006 WL 785621, at *1 (Tex. App.—Dallas Mar. 29, 2006, no pet.) (mem. op.) (citing *Eris*, 39 S.W.3d at 715).

Sharma argues that although the couple had cohabitated and had a child together, their conduct was insufficient to satisfy the holding-out element because (1) the couple had separate bank accounts and were not involved in each other's finances; (2) Sharma had filed her income tax returns as "single" or "head of household" from 2006 through 2022, thus representing to the federal government that she was unmarried; and (3) since 2006, she had executed property leases as a single person, had purchased car insurance in her name only as a single person and covering only herself, and had purchased the Windthorst and Jasmine Springs homes in her name only. She contends this case's facts are like those in *Small*, a case in which one of our sister courts held that the following evidence was factually insufficient to support the holding-out element:

> (1) Murriah presented evidence, exclusively from her own witnesses, that she and Jack held out to some family, friends, and acquaintances that they were married; (2) Jack presented evidence, through his witnesses, that he never held out to others that he was married to Murriah; (3) there was no evidence showing the couple had a reputation in the broader community as a married couple; and (4) the overwhelming weight of the parties' other conduct and actions is contrary to Murriah's claim of an informal marriage.

352 S.W.3d at 287. Specifically, the evidence showed that Murriah—the party seeking to establish the informal marriage—had filed her federal income tax return as single, had applied for car insurance and credit cards as single, and at Jack's request, never filled out any document as "married." *Id.* at 286.

While some of the facts here are like those in *Small*, other facts lead to a different outcome. Here, Jani testified that after the July 2006 ceremony, Sharma continued to wear the mangalsutra, which symbolized that she was a married woman, and that she wore it during a housewarming ceremony for the Jasmine Springs home after it was purchased in 2011. Photographs from that ceremony show that it was conducted by a priest with people other than Sharma and Jani in attendance. Although Sharma denied that the necklace she had received from Jani in July 2006 was a mangalsutra and denied that the necklace she was wearing in the photographs from the 2011 housewarming ceremony was a mangalsutra, the trial court could have resolved the conflicting evidence against her. The trial court could have reasonably concluded that by wearing the mangalsutra, Sharma was holding out that she was married to Jani.

Additionally, in May 2013, Sharma and Jani signed the Affidavit of Marriage, which was notarized and signed in front of two witnesses in Denton County, Texas. Although Sharma denied signing it, testimony from Jani, the notary, and the handwriting expert supported the opposite conclusion. And two months after the affidavit's signing, in July 2013, the couple signed two consent forms with the Dallas

23

Fertility Clinic in spaces labeled "husband" and "wife." Sharma claimed she did so because there was no place on the forms to explain the status of their relationship and that she told clinic representatives that the couple was unmarried. But according to Jani, the Dallas Fertility Clinic treated only married couples at that time. Again, the trial court resolved the conflicting evidence against Sharma and concluded that she held out that she was married to Jani.

When, as here, the evidence is conflicting about the existence of an informal marriage, the conflict must be resolved by the factfinder. *See In re Est. of Walker*, No. 2-08-371-CV, 2009 WL 1996301, at *4 (Tex. App.—Fort Worth July 9, 2009, no pet.) (mem. op.). Applying the applicable standards of review, we conclude that some evidence supports the trial court's implied finding that the couple represented to others that they were married. We likewise hold that the credible evidence supporting the finding was not so weak that the finding should be set aside and a new trial ordered.

Having concluded that the evidence suffices to support the trial court's implied findings on the required informal-marriage elements, we conclude that the evidence supported the trial court's finding that Sharma and Jani were informally married. We thus overrule Sharma's second issue.[15]

---

[15]Within her second issue, Sharma also argues that her pleadings claiming that she was married to Jani were not judicial admissions and that the parties had not entered into a putative marriage. Given our holding that the evidence is sufficient to

24

## C. Fraud on the community

In her third issue, Sharma claims that the evidence is legally and factually insufficient to support the trial court's fraud-on-the-community-estate findings. She contends that she "proved that—regardless of the source of the funds—she spent those funds on community expenses, reasonable living expenses during her unemployment, and her medical bills incurred during the pendency of the case." She alternatively argues that even if sufficient evidence supports the trial court's fraud-on-the-community findings, "the amount ordered by the trial court to restore or reconstitute the estate far exceeds the amount purportedly expended for fraudulent purposes."[16]

### 1. *Applicable law*

Fraud on the community is not an independent tort "but a means of redress for a deprivation of community assets to be considered as part of a just and right division of the community estate." *Miller v. Miller*, No. 14-17-00293-CV, 2018 WL 3151241, at *5 (Tex. App.—Houston [14th Dist.] June 28, 2018, no pet.) (mem. op.) (citing

---

support the trial court's informal-marriage finding, we need not address those arguments. *See* Tex. R. App. P. 47.1.

[16]Jani asserts that Sharma failed to preserve her third issue for appellate review because she did not move for a new trial on that issue or request findings of fact and conclusions of law. In a bench trial, however, legal- and factual-sufficiency complaints may be raised for the first time on appeal. *See* Tex. R. App. P. 33.1(d); Tex. R. Civ. P. 324(a)–(b). Sharma's failing to request findings and conclusions does not affect error preservation, but it does require us to imply all fact findings necessary to support the trial court's judgment. *See Shields Ltd. P'ship*, 526 S.W.3d at 480.

*Schlueter v. Schlueter*, 975 S.W.2d 584, 589 (Tex. 1998)). "Judgments for fraud on the community are part of [the trial] court's property division." *Clarke v. Clarke*, No. 08-23-00016-CV, 2024 WL 347938, at *9 (Tex. App.—El Paso Jan. 30, 2024, no pet.) (mem. op.). We have previously explained the concept of fraud on the community:

> A fiduciary duty exists between a husband and a wife regarding the community property controlled by each spouse. Although a spouse has the right to dispose of community property under his control, he may not dispose of his spouse's interest in community funds if actual or constructive fraud exists. "Fraud on the community" is a judicially created concept based on the theory of constructive fraud and is applied when there is a breach of a legal or equitable duty which violates the fiduciary relationship existing between spouses. Although not actually fraudulent, any such conduct in the marital relationship is termed fraud on the community because it has all the consequences and legal effects of actual fraud.
>
> Constructive fraud does not require an intent to defraud but is instead the breach of a legal or equitable duty that the law declares fraudulent because it violates a fiduciary relationship. A presumption of constructive fraud arises when one spouse disposes of the other spouse's interest in community property without the other's knowledge or consent. The disposing spouse then bears the burden of proof to show fairness in disposing of community assets.

*Dailey v. Dailey*, No. 02-12-00097-CV, 2013 WL 105667, at *3 (Tex. App.—Fort Worth Jan. 10, 2013, no pet.) (mem. op.) (citations omitted).

The three primary factors for determining fairness are (1) the disposed property's size compared to the community estate's total size; (2) the estate's adequacy to support the other spouse after the disposition; and (3) the relationship of the parties involved in the transaction or, in the case of a gift, of the donor to the donee. *Puntarelli v. Peterson*, 405 S.W.3d 131, 138 (Tex. App.—Houston [1st Dist.] 2013, no

26

pet.). Upon determining that a spouse has committed fraud on the community, the trial court must reconstitute the community estate—before making its just-and-right division—by calculating "the value by which the community estate was depleted as a result of the fraud on the community and . . . the amount of the reconstituted estate," which is "the total value of the community estate that would exist if . . . fraud on the community had not occurred." Tex. Fam. Code Ann. § 7.009(a)–(b); *see also id.* § 7.009(c). "A claim for the improper depletion of the community estate may be resolved by the trial court with an unequal division of the community estate, or a money judgment in order to achieve an equitable division of the estate." *Puntarelli*, 405 S.W.3d at 138 (citing *Schlueter*, 975 S.W.2d at 588).

2. *Application*

Here, Sharma does not dispute that she disposed of community property without Jani's knowledge and consent. As noted, in June 2019, the trial court made temporary orders providing that Jani could live in the Jasmine Springs home if he timely made the $1,694.58 monthly mortgage payment on the property beginning June 1, 2019. The court-ordered mortgage-payment amount was based on Sharma's representation to the trial court.

Starting in June 2019 and through the last day of trial, Sharma collected funds from Jani that—unbeknownst to him—were more than the actual mortgage payment on the Jasmine Spring home, and she retained the excess, which ranged from $233.16 to $552.33 per month. And for several months, she did not make the

27

mortgage payment at all and kept the funds that Jani had paid to her. Because of those missed payments, Sharma restructured the mortgage in September 2021, causing the principal balance on the Jasmine Springs mortgage to increase by about $5,000. Both Sharma's defaulting on and restructuring the loan were without Jani's knowledge. Additionally, when Sharma changed jobs in December 2020, she liquidated a $20,986.04 retirement fund, deposited the funds in her bank account, and immediately started withdrawing them.[17]

Sharma maintains, however, that the evidence is insufficient to prove constructive fraud because the retirement funds and the mortgage payments that she retained were not wasted or unaccounted for because she was using the funds to pay for her medical and living expenses. Sharma testified that while the case was pending, she had periods of unemployment, and she was diagnosed with cancer in July 2021 and was thus on unpaid medical leave for about a year with only "some" short-

---

[17]During oral argument, Sharma admitted that her withdrawing and spending the retirement-account funds without court permission violated the standing order that applies in every Denton County divorce suit and suit affecting the parent–child relationship. Among other things, this standing order prohibited the parties from "[m]aking withdrawals from any account in any financial institution for any purpose" and "[w]ithdrawing or borrowing in any manner for any purpose from any retirement, profit-sharing, pension, death, or other employee benefit plan or employee savings plan or from any individual retirement account or Keogh account," except as specifically authorized by the standing order or subsequent court order.

The standing order also prohibited the parties from mortgaging or encumbering any party's real property, except as specifically authorized by the standing order or subsequent court order. Sharma's actions in restructuring the mortgage arguably violated this provision.

term disability for income. When asked about "pocketing" the mortgage payments since June 2019, she explained, "I was not pocketing them. I was -- I had my surgery. I was going through hardship. And I had to use that money, and I had to restructure the loan." She further explained, "I had to use [the money] for my medical expenses." This was the extent of Sharma's attempt to account for those funds. She offered no evidence of her medical expenses, and her cancer diagnosis came two years after Jani had started paying the Jasmine Springs mortgage. Jani testified that Sharma had not provided him with an accounting of how she spent the retirement funds, and Sharma offered no testimony regarding the use of those funds.

We thus conclude that the evidence sufficed to create the constructive-fraud presumption. Sharma does not argue on appeal that she rebutted this presumption by showing fairness in disposing of the community property nor does she point to any evidence showing fairness.

After considering all the evidence, and deferring to the factfinder on credibility issues, we conclude that a reasonable factfinder could have found that Sharma committed constructive fraud on the community and that she failed to rebut the presumption that she committed constructive fraud. *See Loaiza v. Loaiza*, 130 S.W.3d 894, 902 (Tex. App.—Fort Worth 2004, no pet.) ("By failing to show the fairness of the expenditures, [husband] failed to rebut the presumption of constructive fraud that arises when one spouse disposes of the other spouse's one-half interest in community property without [her] knowledge or consent."). We thus hold that the trial court's

determination was not so weak and against the great weight and preponderance of the contrary evidence that it is clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176. Accordingly, we overrule this portion of Sharma's third issue.[18]

In the remainder of her third issue, Sharma argues that the evidence is factually insufficient to support the amount of the fraud judgment in the decree. In the decree, the trial court found that Jani was entitled to a $42,362.55 judgment against Sharma. The trial court arrived at the judgment amount based on the following calculations recited in the decree:

- Sharma collected sums from Jani "as mortgage payments which were not applied to the mortgage for the Jasmine Springs house in the amount of $233.41 for 28 months in the amount of $6[,]535.48";

- Sharma collected sums from Jani "as mortgage payments which were not applied to the mortgage for the Jasmine Springs house in the amount of $1[,]694.58 for 12 months in the amount of $20,334.06";

- Sharma caused "the principal balance on the Jasmine Springs house to be increased from $109,000 in November 2020 to $114,000 in September 2021 as a result of modifying the loan on the Jasmine Springs house in violation of Court orders and without [Jani]'s agreement, causing the balance owed on the Jasmine Springs house to be increased by $5[,]000.00"; and

- Sharma wasted Jani's "community interest of $10,493.02 in the [retirement] account under her control as a result of her liquidation of said account during the pendency of this divorce without court order or approval, and without [Jani]'s agreement."

---

[18]Because the evidence sufficed to support the trial court's constructive-fraud finding, we need not address the trial court's actual fraud findings. *See* Tex. R. App. P. 47.1.

Sharma argues that the $31,869.53 the trial court awarded to Jani "as compensation for the money [he] paid to her" for the Jasmine Springs mortgage is too high[19] and that the trial court erred by awarding him his community interest in the retirement account because there was no fraud. We disagree with the latter contention because we have held that the evidence sufficed to support the trial court's constructive-fraud finding. We agree, however, that the trial court's calculation of the mortgage amounts Jani had paid to Sharma that were not applied to the mortgage was not supported by the evidence.[20]

Based on the mortgage statements admitted into evidence and Jani's testimony, Jani made mortgage payments to Sharma from June 2019 through July 2022— 38 months—not for 40 months as stated in the decree. During the 38-month period, the actual monthly mortgage payment due ranged from $1,142.25 to $1,461.42. Each month that Sharma paid the lender, she kept the difference between what Jani had paid her and the actual amount that she paid to the lender. In addition to keeping the excess funds, there were some months when Sharma made no payment to the lender and pocketed the entire $1,694.58 payment from Jani. Because of those missed

---

[19]The trial court awarded $31,869.54 to Jani for his mortgage payments to Sharma and the principal increase—$6,535.48, plus $20,334.06, plus $5,000. Sharma's calculation is off by a penny. It appears that the trial court's total fraud judgment award is off by a penny as well.

[20]Sharma does not challenge the $5,000 the trial court awarded Jani for the increased principal balance on the Jasmine Springs mortgage.

payments, Sharma restructured the loan, causing the principal balance on the Jasmine Springs mortgage to increase by about $5,000.

At trial, Jani testified in response to leading questions by his attorney that Sharma made no mortgage payments for 12 months. Sharma disagreed that she had missed that many payments, and we agree with her. The mortgage statements reflect that Sharma missed five, rather than 12, payments.[21] In those five months, Sharma collected from Jani $8,472.90 that was not applied to the mortgage.

Jani further testified that for 28 months, he had paid Sharma $233.41 more than the actual mortgage payments. The mortgage statements, however, reflect that during the 33 months in which Sharma did pay the mortgage, the overpayment from Jani that Sharma kept ranged from $233.16 to $552.33 per month, rather than the $233.41 per month for 28 months to which Jani had testified and that is reflected in the decree. Based on the mortgage statements themselves, we have calculated that during those 33 months, Sharma collected from Jani $10,531.99 that was not applied to the mortgage. Overall, Sharma received from Jani just over $19,000 that she failed to apply to the Jasmine Springs mortgage, almost $7,900 less than the $26,869.54 that

---

[21]Jani was forced to obtain Sharma's mortgage and bank records by subpoena because she had refused to supplement her discovery responses. Jani received these financial records the day before the final day of trial and thus arguably did not have time to study them. A cursory review of the mortgage statements leads one to conclude that Sharma missed 12 payments because she was late on several mortgage payments, and these payments were not reflected on mortgage statements until months after they were due. A more in-depth review of these records thus reveals that after the late payments were applied, Sharma missed five payments total.

the trial court awarded for the unapplied overpayments and missed mortgage payments.

After considering and weighing all the record evidence, we conclude that evidence supporting the amount of the trial court's fraud findings of $6,535.48 and $20,334.06 for the sums Jani paid to Sharma that she did not apply to the mortgage is so weak that the judgment must be set aside and a new trial ordered on the division of the estate. *See Jacobs v. Jacobs*, 687 S.W.2d 731, 733 (Tex. 1985) ("[O]nce reversible error affecting the 'just and right' division of the community estate is found, the court of appeals must remand the entire community estate for a new division."). We thus sustain this part of Sharma's third issue.

## IV. Conclusion

Having sustained Sharma's third issue in part, we reverse the trial court's fraud findings of $6,535.48 and $20,334.06 and remand the case for a new and correct division of the community estate. We affirm the rest of the divorce decree.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: May 9, 2024